Let's wait just a minute until everyone gets settled. Okay, Mr. Adler. Good morning. May it please the court. I represent five of the deputy appellants in this case, four of whom who had no contact with the plaintiff appellee, one who was responsible for the dog that eventually entered the vehicle in an attempt to remove the plaintiff. This case stems from a 40 minute vehicle pursuit, followed by a several hour standoff, where the plaintiff appellee refused at all times to comply with the lawful commands of several dozen law enforcement officers. The case should be reversed and rendered because the plaintiff appellee has not provided, either at the district court level or before this court, the requisite precedent that would have put the officers on notice that any of their actions were illegal, unconstitutional or beyond reasonable. I have quoted in my brief a list of 20, 20 different actions. So page eight starts on page 18, my brief, 20 different actions that the officers took over the course of the several hour standoff. And as I said, there is no precedent that the plaintiff appellees have cited that would indicate any of their actions were unreasonable, either in a specific individual context or in the overall context of this developing situation. All of them, all of the actions they took escalated in nature, started out with verbal commands to stop the vehicle. This is an 18, I'm sorry, an 80,000 pound 18 wheeler that the plaintiff appellee was driving, refused to stop. They put out spike strips. He drove over the spike strips that flattened the vehicle's tires. He continued to try to drive. The officers made a variety of attempts to contact him. I think over 70 phone calls were made to him. They contacted his employer, asked the employer to contact him. They used a translator to reach him, try to contact him. Eventually the decision was made to escalate. They did fire some non-lethal foam rounds. I would note the plaintiff appellee refers to them as rubber bullets. They were not rubber bullets. They were foam rounds that were fired at the vehicle. And eventually they introduced chemical irritant into the vehicle. Mr. Cutsall still refused to exit. The dog was put into the vehicle, it did bite him. He refused to exit the vehicle. Eventually the officers went in and physically removed him from the vehicle. Counsel, what was the threat that the officers perceived? In a normal case with escalation, I get it. I understand the threat. But what was the concern that would cause a three-hour standoff and closure of I-10? The beginning of the threat was the vehicle itself. It's obviously a large, moving vehicle. Something's not right, to put it in the vernacular. But for over 90 minutes before the officers deploy force, it's clearly disabled. Correct. Way more than 90 minutes. So I'm not sure threat is really the question, although I understand your question. They did block I-10 for several hours in the middle of a business day. And so although no officer was physically threatened at that point, the question, I think, for this court is what more could they have done? They can't simply leave him there in this vehicle, disabled, on the side of the road. One of the arguments the plaintiff appellee makes is that he was in need of medical attention. And obviously the officers have a responsibility, if that's the case, to respond with appropriate medical attention. What is this preexisting sepsis from COVID? That's recited, but can you describe his condition, physical condition? Honestly, Your Honor, I think that's a great question, and I don't know the answer to that. I mean, he was capable of driving an 18-wheeler on an interstate highway. So I don't know what the condition was that would have stopped him from complying with the officers' numerous repeated commands, requests, cajoling, please come out of the vehicle. So, again, to answer your question, Judge Odom, there was no threat, but something had to be done with this situation. They tore off the door of the cab of the truck, please come out, no response. They introduced tear gas, what's commonly known as tear gas, no response. Eventually the decision made after several hours, we'll use the dog to come in. They noticed that he was carrying some knives, which brings me to another part of the argument I'd like to raise here today. I think it's critical in evaluating the officer's actions that the court be clear that there are three areas of what I would say are significant mischaracterizations on the part of the plaintiff. That involves whether there were weapons involved, whether he was resisting, and whether he was unconscious. Well, it is motion to dismiss, right? So the complaint alleges he's having a medical episode. Judge Higginbotham's question says he's having a medical episode. We've seen these cases before where someone's having a seizure while driving. And so I'm having a hard time understanding why someone who's having a medical episode bound by Rule 12 to say that it's true would require what looks like a land invasion in Normandy or something. Well, again, if he is having some type of medical situation, the deputies have a responsibility to respond. They have to get to him, but they can't enter the vehicle without knowing whether he's got weapons. As they approach the vehicle, they find out he does in fact have weapons. No paramedic or EMT is going to, the deputies could not have said, okay, you guys go in and check him out. I think the deputies would have, the paramedics would have reasonably said, is it safe, does he have any weapons? We don't know at this point. So when the deputies finally do enter the vehicle, whatever medical situation he was facing, he was capable of fighting the deputies. And as I said, the Plaintiff Appellee talks about he didn't have any weapons, he wasn't resisting, and he was unconscious. All of that is contributed by the evidence in the case. Well, he would have known that the officers had a right to require him to get out of the vehicle. That's settled by the Supreme Court as a protection of officers. And they can do that now. They go to, as you were describing it, they couldn't open the door. I think, Judge, the concern was if he has a gun and someone goes up and opens the door. I understand his concern, he has a gun. What's the basis of that? I think given the erratic behavior, his refusal to comply with demands to stop the vehicle. Does that mean he's got a gun? I'm sorry? I said, it doesn't mean he's got a gun. Correct. It's a general risk that anyone might have a weapon. That's why you constitutionally command the guy to get out of the car, and if he doesn't do it, you can then take him out of the car. And that's exactly what happened here. He was repeatedly told to come out of the vehicle. He was really begged to come out of the vehicle. They were talking to him, and he was talking back to them. I'm sorry? They were communicating. He was not responding. He didn't say anything. He just sat there. The door was locked. I don't know if it was locked. I think it probably was, but he just sat there. It probably was. I mean, the door could, obviously it could do that. I don't know if it was unlocked. You have to remember, Judge, this is an 18-wheeler, so the seat of the cab is five feet high.  It's still a door. It's on a big truck, but you can lock it. One day he just opened the door. I don't understand. Because he might have a gun. I don't think it's reasonable to expect a law enforcement officer to go to that situation and open the door after a repeat. Are you saying they didn't try to open the door? There's no evidence in the record whether they tried to open the door or not. I know they used an armored vehicle to remove the door from the cab, so in that sense, yes, they tried to remove the door, and it was removed. They didn't open the door, but they're going to remove it. Correct.  I take it he locked the door. The door must have been locked, are you? Otherwise, I don't know why you would remove it. Because I think the officers were afraid of getting shot. But there's no evidence that he had a gun, and they had no reason to think he had a gun. Law enforcement officers never have a reason to think someone has a gun until they see and observe the person. This person was up high, and they could not see that. When they did see it, they saw that he did have knives on him. They did enter the vehicle and try to restrain him. Again, whatever medical emergency he claims now, he was quite capable of fighting with the police, locking his feet under the dashboard to stay in the truck. He successfully resisted the dog's attempt to remove him from the vehicle. He continued fighting as they got him out of the truck and tried to handcuff him, and he was even fighting later on at the hospital. So I don't know what the medical situation was as far as sepsis. The reality of it is he was resisting, actively resisting. He was not unconscious, as the plaintiff appellee claims, and he was armed with some dangerous weapons. If there are no other questions, I see my time has expired. Yes, you've saved time for rebuttal. Thank you, Mr. Kunieski. Thank you, Your Honor. I represent eight City of Houston SWAT officers, and the facts are the same for Mr. Adler and me, and so I will just accept what he said and not go back into the facts. But one thing that I want to point out is that they were arresting this gentleman for felony evading, and they had the right to arrest him. So it's not just a situation we leave him there. They're telling him, we're arresting you for evading. It's like a slow chase like OJ Simpson that lasted for 45 minutes, but they had the right to arrest him. And so they tried to. How long did it take to stop the tractor-trailer? They were virtually able to stop it by throwing out the spikes. Do you know how much time there was between? Because when they first saw him and had probable cause to stop him, he was going very slowly on the interstate. It's my understanding he was going about five miles an hour for about, I think, 42 minutes. And during that period of time, there was a whole group of patrol officers in cars, just like an OJ Simpson. They were announcing over loudspeakers, you know, pull over. It was a low speed. We know about high speed chases. This was a low speed chase. Exactly. It was a low speed chase. But it was a chase nonetheless, and they had no ability to pull him over, and they were over loudspeakers telling him to pull over. They're waving for him to pull over, and he's just looking straight ahead, ignoring that he even sees that they're there. In the meantime, the freeway's been closed or blocked off. I think they're blocking it off, yes. And they had to throw out the spikes, and I think it took three sets of spikes to eventually get him to stop. And even then, he's sitting there steering like he's driving a truck, which he's not, pretending he's going through the gears. The tires are spinning. You know, he's a danger, and they can't just leave him there for a couple of reasons. He's a danger to himself. He's a danger to others, and he just committed a felony. And he might be in medical distress. He may be, so they don't know. You know, now we're looking back at what the medical records show, but at the time, you've got to look at what the officers thought at the time. And at the time, they thought one of three things. He's either under alcohol, drugs, or medical. We don't know. I mean, we can later debate exactly whether it was sepsis or whatever, but you've got to look at what the officers perceived at the time of the event. And so they're basically seeing somebody that's totally irrational, totally out of it, thinking he's driving the truck when he's not. And I think what they did was a model. This case could be shown to other officers as to how to deal with a dangerous situation, slowly escalating everything. I mean, they waited three hours. So I think everything they did was a model of what officers should do. How did they ultimately get him out? Excuse me, Your Honor? How did they ultimately get him out of the cab? Well, ultimately, it took four different officers getting in the cab and physically pulling him out as he was fighting them. He had a knife, and one of them grabbed his wrist. Two of them ended up punching him. No weapons were used, no tasers. So they ended up just pulling him physically out of the cab. Physically pulled him out. They grabbed him by the waist and physically pulled him out. How did they open the door? Excuse me? How did they open the door? Well, I think the door was opened by what they call that rook. A rook, a machine that tears off doors, houses, et cetera. So for the safety of the officers, they don't have to get up and deal with it. The door is torn off by this machine. And one of the things I wanted to point out, and I would be interested in seeing how the other side distinguishes the case, of Anderson v. Estrada. And Judge Olden, you were on that case. You were on that panel. I happened to represent one of the officers. Interestingly, Mr. Adler represented one of the officers. And I believe that case is almost exactly on point. In that case, what they were trying to do is get somebody in a vehicle. And just like this case, they tried and tried and tried without using any force. Eventually, they ended up tasing him, a dry stunning of him, and he died as a result of it. He was on PCP at the time. And a combination of the taser and him being on drugs, he died as a result. But in any event, the court in that case went through all the analysis, I believe. Either he was out of the truck or inside the truck. In that case, they were trying to get him into the police car. And they had him halfway in. And he was a big guy, and he wouldn't get the rest of the way in. And he was bracing with his legs. And we filed a motion in that case to dismiss qualified immunity. And Judge Bennett and the court below found that there was no, quote, resistance because the guy was handcuffed. But what this court found is it doesn't matter that he was handcuffed. He can still resist. And in that case, the fact that he was acting very strangely, erratically, that he was bracing his legs was resistance. All the exact same factors as in this case. The only difference is, in that case, they were trying to get him in the vehicle. In this case, they're trying to get him out of the vehicle. And I could, but I don't think I need to go over each one of them. But each officer needs to be considered separately. Counsel, can I ask a clarifying question about something you said earlier? I think maybe in response to Judge Ingrambotham. You said, look, you said what matters is what the officers knew.  I think what you meant was that what matters is what a reasonable officer and the situation with the present effects would know. A reasonable officer, you said, in that circumstance would think, drugs, alcohol, or medical. Correct. Why would drugs, alcohol, or medical require any force? Well, because of the way that he was acting. He was very erratic. It's almost the same as in Estrada. Why was any force required? He wouldn't get in the vehicle. In this case, he wouldn't get out of the vehicle. No force would have been used whatsoever if he would have complied. I had a case a few years ago where a guy was on a highway, and he had a medical, he was hit as a seizure, right, and was slumped over on the steering wheel of the car. But the police didn't, like, get a rook and rip the doors off and send the dogs in. I don't think in that case he was acting totally erratically. He's behind the wheel pretending that he's still driving an 18-wheeler, going through the gears and spinning tires, ignoring instructions for 45 minutes. I mean, I think that's distinguishable. And I think what the officers did in this case was actually a model. I mean, I think Mr. Cutshaw owes his life to them. These are trained marksmen. They had weapons. He was armed with knives. They never fired a shot. One of them handed off his gun before he got into the cab. They never used a baton. They never used a taser. I mean, they used, quite frankly, the minimal amount of force that was necessary to get him out of the vehicle. And I don't think that they're, like Mr. Adler said, any cases that would show that what they were doing was not permitted by the Constitution. Well, also, I mean, they had some kind of an obligation, eventually, to reopen the freeway, right? This is a major east-west interstate. I mean, it's a huge interstate that's been shut down for hours. I mean, yes, I mean, I think that is something, that they can't just leave him there forever. But even putting that aside, I mean, you can't have a guy behind the 18-wheeler truck pretending to be driving, not knowing what's going on, who's just committed a felony evasion. All right, thank you. You've set a time for rebuttal. Thank you. Mr. Givens. Hi, Your Honors. My name is Attorney Garrett Givens. I'm lead counsel for the Appalachian-Trinidad-Cut-Shaw-May Police Court. I want to start off and just say that being in front of you three and being here has been my life's joy and honor. And I'm very excited and humbled by the opportunity and the privilege, and I appreciate y'all's time today. A little bit of background about this case is I was actually the lead criminal defense lawyer on this criminal case, so I was privy to absolutely everything that the opposing counsel factually discussed today. And as an officer of the court of eight different states, Mr. Cut-Shaw has told me several times, Mr. Givens, I just don't remember a single second from that day. He completely blacked out. And when I first heard about this case... You need to be real careful not to go outside the record. We have a record on appeal that we'll decide the case on, so... Yes, Your Honor. ...side conversations and other things that aren't in the record are way out of bounds. Yes, Your Honor. Well, then let me start with the Anderson versus Estrada case that Mr. Kenianski asked me to distinguish. The victim in that case was on PCP, and he crashed his car at 4 in the morning, and he was arrested for a DWI. The experts in that case said that PCP gives human beings super strength, and when people are on PCP, they're extremely strong. This case is distinguishable because the record clearly shows that Mr. Cut-Shaw was neither intoxicated by any alcohol nor was under the influence of any illicit drugs. Something else that Mr. Ken... How did the officers know that one way or the other during the time frame when they're being charged by you with unconstitutional conduct? Right. To answer your question, Your Honor, I think the best case to answer your question is the Barnes versus Felix case. This honorable court in 2025 utilized what was called the moment of the threat rule, and I just heard Mr. Kenianski say it a minute ago. Heated the passion. How are they supposed to know? The age-old argument is that hindsight is 20-20. Back in 2025, just a few months ago, the very issues in Barnes versus Felix went out to the Supreme Court, and the Supreme Court said, you know what, that is an erroneous ruling to let officers off the hook for using that age-old excuse. Hindsight is 20-20. Heated the passion. We just didn't know. The United States Supreme Court made very clear that you have to look to the totality of the circumstances. It's not just enough to put yourself in that moment and then say that we have clean hands. So what, in your argument, should the police officer do? Yes, Your Honor, thank you very much. What the officers should have done, and we have to remember, I don't know how many officers that were out there, but there were helicopters, there were a lot of them, okay, a lot versus one. And the officers should have de-escalated the threat, isolated the threat, and made sure that Mr. Cutshaw was medically okay. Yes, you describe a conclusion, but how do they do that? I would urge this court to look in my brief to footnote number two. The record clearly shows that a myriad of the different officers knew that something weird was going on. Sergeant Carrasales, who was leading this investigation, even noted there's a strong possibility of a medical emergency. So how would they have done it? Well, Your Honor, there were helicopters. We just heard Mr. Adler mention what was called the rook. That's a big tractor that ripped off the door. I'm using the word tractor. The court may use another word. We know what they did, but you're arguing that it was unreasonable. So you must be able to articulate what was a reasonable course. Plainly, they had to take some action. Well, I can say, Your Honor, that this honorable court has said on numerous occasions that qualified immunity applies when an official violated. So qualified immunity applies unless an official violated a constitutional right, and that right was clearly established at the time. Okay, so this court has said numerous times that it's clearly established, Your Honor, that when somebody is subdued and when they're not resisting, any use of subsequent force is completely excessive and unreasonable. That was in the Santander opinion, Spiller v. Harris, Carroll v. Ellington. All right, so you told us a minute ago that, to quote you, you said they should have isolated the threat. Different from what they actually did, because you complained about that, what should they have done to isolate the threat without, in your view, violating the Constitution? I think what they could have done, which was very easy, would have been just to handcuff him, and then once he was handcuffed, that should have been enough, and then they should have immunity. Well, but first they have to stop the vehicle, right? Yes, Your Honor. They can't handcuff him while the vehicle is moving. Is that right? Yes, Your Honor. And they would have some obligation based on their training and experience to see whether he had any weapons. Is that right? Yes, Your Honor. And they would have some obligation to observe any kind of obvious medical condition. Is that right? Well, you know, I think that in a situation like this, they should have just de-escalated the whole thing, and that's not what they did. Well, so let's just start from the beginning then. You're the one who said they should have isolated the threat. So he's driving down a major interstate at five miles an hour. Is that right? Yes, Your Honor. Okay. So obviously law enforcement is summoned. So go through step-by-step what they should have done from the time that they saw him there to what you say is to handcuff him. Yes, Your Honor. So I believe that this court is touching on the third prong of the excessive force analysis, which is what is construed as reasonable. In Graham v. Conner, the 1989 United States Supreme Court case, they utilized three factors the Graham court did to assess whether something was objectively reasonable or unreasonable. Now, let's get back to my question. I think this is the third time it's been asked. Step-by-step, what should they have done to isolate the threat that would not have, in your view, violated the Constitution? Okay. Stop the 18-wheeler. I'll go back. Should have shut down the freeway, which is what they did. Stop the 18-wheeler. But then as soon as they entered the cab. To stop it, they could have used the strips, which they did use. Is that right? Correct. Yes, Your Honor. Or should they have stopped it in some other way? I assume that that's okay with you, that they used the strips to disable the vehicle. Yes, Your Honor. I think that's fine. I think where they messed up was getting in that cab and ripping in the while another guy was simultaneously punching him in the back of the skull and to the point of unconsciousness. And that's all on body camera footage, which I know this court does not want to see because it's outside the record, so I'll stay in the record. But the bottom line is that's just a material fact that I can't ignore because I've seen that footage. And it's the worst footage I've ever seen in my life. So they almost killed this guy, and that's on body camera footage. Okay. If you go outside the record one more time, then your time has expired and you can sit down. Okay. Is that clear?  So where's that body camera? It's not in the record? No, Your Honor. And I'm going to stay inside the record from here on out? I understand that. But I'm asking you to do that because it's not in the record. I'll just recall a case where you have a record and you brought a lawsuit and there is a discovery. If there is such a record, it never got into the record. I mean, it never got into the court record. You say there's a film of this, all this beating and so forth. But my question is, where is it? Where is the film? Yes, Your Honor. I want to be very careful. Well, you're not going outside the record to say that you don't have the film and you didn't try to get it? Right. So I'd say at this stage, and I want to respect Judge Smith, I want to be very careful. You know, right now, this is a 12B6. There's been no discovery that's been exchanged. I haven't even had an opportunity to take one deposition in this case. There hasn't been a single scintilla of discovery exchanged. And Judge Oldham, you know— Why not? Well, because it's—I mean, we just filed suit, and as soon as we filed suit, immediately there was a 12B6 motion to dismiss on qualified immunity. And as Judge Oldham just said, at this stage in the proceedings, jurisprudence is very clear that all facts are construed in light most favorable to the plaintiff. And so factually, if there's something in the complaint, light has to be construed in most favorable to the non-mover. So let's go back to what they should have done step by step. So they've disabled the vehicle by using the strips so that the vehicle has stopped on the freeway. Yes, Your Honor. And the freeway's been closed or blocked off in some way. All right. Now, are you complaining about the—you said they should have handcuffed him. How did they get the door open? First, they have to get the door open in order to handcuff him. Is that right? Yes, Your Honor. Okay. And they ask him repeatedly to exit the vehicle or at least open the door, I assume. Is that right? Yes, Your Honor. All right. So do you have a problem with the fact that they forced the door open or tore the door off or whatever it is that they did? I have a problem with particularly everything that I cited in footnotes 3 to 6. Right there, it's a total confusion. Yes or no, do you have a problem with the fact that they, in some way, managed to either get the door open or tear the door off before they, in your view, should have handcuffed him? No, Your Honor, I don't. Okay. All right. So what's the next thing that they did that was wrong? After— I mean, they kept telling him to get out. You don't deny that? I don't, but footnote 2 clearly shows that he wasn't responding. I mean, the lead sergeant, Sergeant Carrasalla, said he was staring in a blank space the entire time. He had no conception of what was going on, none whatsoever. Okay. And opposing counsel said that he was sitting there pretending as though or thinking that he was actually driving the vehicle, turning the steering wheel maybe or shifting the gears or whatever when he really wasn't. Is that fair? That's totally true. He was dazed and confused. And when I first heard this case, I thought he was under something, and then the medical records came back and showed that he was completely sober, which was wild. So there was something going on up here. He wasn't in reality. He was not. And so to answer your question, Judge Smith, very clearly, what should they have done? I think just once they get their hands on him, I don't know. I mean, however they can at least get in that cab and figure out what the heck is going on at that point. A hundred men versus one. That's enough. You certainly don't sit dogs. You don't shoot with rubber bullets. You don't deploy tear gas. And so what they could have done, I mean, you know, again, back to the law. Barnes versus Felix. You know, you have to be able to tell us what these officers should have done in that situation, if anything, without violating the Constitution. And I haven't heard you say that yet. Put Mr. Cutshaw in handcuffs. I want to be very clear. Put him in handcuffs, and as soon as he's placed in handcuffs, get him on the ground and get the paramedics over there. And they didn't do that here. What they did here was there's rubber bullets, tear gas, dogs, bare fists, all simultaneously. And this was after numerous officers already acknowledged that he wasn't in his right mind. And the court has been very clear, particularly in the Darden versus City of Fort Worth case. It says, A constitutional violation occurs when an officer tases, strikes, or violently slams a suspect who is not actively resisting. And that's the key in all these different courts. The Carroll versus Ellington court says the law is clearly established that once a suspect has been restrained and subdued and is no longer resisting, an officer's subsequent use of force is excessive. And so here, Your Honor, he wasn't fighting back because he didn't even know what was going on. And I heard Mr. Adler and Mr. Kenianski say over and over again that there were knives. All he had was a pocket knife. He's an 18-wheeler driver. It's not illegal to have a pocket knife. He wasn't in the cab trying to stab people. And so, Your Honor, I think what happened here was clearly excessive. Again, in the Austin versus City of Pasadena case, it said, Using force when a suspect is not resisting due to a medical emergency. And that's on point, Judge Smith. Using force when a suspect is not resisting due to a medical emergency violates the Constitution. And so I could go on and on with every particular example, but the United States Supreme Court in Elder versus Holloway said, it said that the Supreme Court has expressly rejected the idea that it's the plaintiff's burden to identify the universe of statutory or decisional law to see if something has been clearly established. This would have released the defendants because of shortages in counsels and the court's legal researcher briefing. So I'm sure there's a million other cases out there, but at the end of the day, I know in my heart of hearts and in my bones, what happened here was wrong. But do you quarrel with these facts? With the cab open, they opened the cab, a SWAT member approached and observed Cutshaw with his hands obscured in  the deputy then fired three 40-millimeter, less than lethal, foam rounds at Cutshaw. And that displayed a desirable effect on him. But he still refused to exit. Then they saw him lower his right hand out of sight. And at that point, the canine dog was deployed. And it probably bit him on the arm. And then Deputy Marshall then entered the cab and unbuckled his seatbelt, but he was still resisting. And Marshall removed the officer, Deputy Marshall removed the canine officer, that's the dog man, and backed up a few feet and took no further. Then you've got four new deputies come in. And they get in the cab. And then you start, that's the punching that you're describing, those four separate ones. And we did look at qualified immunity. Certainly for the first description there on his face, those officers would appear to enjoy qualified immunity. Now, as you can go forward, then you've got separate officers coming in doing something else. Are these distinct inquiries of qualified immunity? In other words, are we talking about a blanket determination up or down for all actions, or are we talking about really a question of standing as to raise these questions? There's a difference in those levels of conduct. They were distinct groups of officers taking distinct actions. And one can quickly surmise that some way of acting perfectly on its face is nothing unlawful about taking that door off to take him out of that cab. I mean, the law is plain and clear on that. They can't do that. He's obligated to step out of a vehicle. Justice Scalia wrote that a long time ago, and it's stuck. And that is a very basic question on the highway. I've had a lot of officers, a lot of the officers, that's when they prize that they have that right, because that's where they're most at risk, when an officer walks up to the cab of a stopped vehicle. They're vulnerable. And we know that. The law says that. I mean, that's why we knew what the law says. Now, so I circle back to say, how do we look at this case? How ought we look at this case in terms of an application of qualified immunity? Yes, Your Honor, let me be very clear. This is a 12B6 interlocutory appeal, not a summary judgment. So at this juncture, the law is very clear that all the facts have to be construed in light most favorable to the plaintiff. This is a case that a jury deserves to see. I've given you all that, but I still have my question. And so specifically, Judge, your question is, do we look at each officer individually? Well, there were groups of officers who had to perform distinct functions in this case. It's kind of an unusual situation, because he was out there. There were so many officers there. He responded to it in kind of teams, as I understand the record. You had the first team that opened the door and took him out. That's very difficult to me to see. There's no immunity there. I mean, there's no liability there for sure. But then you go forward, and what you say is that, well, some other team came in, and then when he's, quote, helpless, they said they beat him. Now, if that's what the facts are, but those aren't the same officers that went there. So in other words, I'm just looking at how we had to propose the case. You may respond. Okay, and I'm going to respond and sit down. I know my time's out. So, Your Honor, your case is very clearly answered by the Green versus DeMoss opinion, and I think that that way could be a blanket liability for everyone on the basis of bystander liability, because there's four elements in Green versus DeMoss. An officer knew a fellow officer was violating an individual's constitutional rights is number one. Number two, they were present at the scene of the constitutional violation. Number three, they had a reasonable opportunity to prevent the harm, but nevertheless, number four, Chet is not to act. So at one way or another, everything that happened here was horrible, and everybody stood by and watched. With that, I just want to thank you three very much. Again, it's been a true honor and a privilege, and I'll sit down now. Thank you all. Thank you, Mr. Gibbons. I'm sorry, Judge. I said thank you, Mr. Gibbons, yeah. Okay, Mr. Adler for rebuttal. Thank you. May it please the Court again. With all due respect to Mr. Gibbons, the claims that he makes convert this case from an excessive force case to an excessive falsity case. The claim that Mr. Cutchell was not armed is factually incorrect. It's contradicted by the evidence in the case. The claim that he was not resisting is factually incorrect. The record shows that he braced his feet under the dashboard. He grabbed the interior of the cab to stop his removal. He grabbed the officers. He reached for knives. He was fighting and attempting to bite the officers. He was pulling away while they had him on the ground and they were trying to cuff him. And as I said earlier, he was still resisting at the hospital where he attempted to hit the hospital staff. Counsel, I just want to be clear. Are you quoting from the complaint? No, I'm quoting from the evidence. I'll give you the cites to the evidence in the case. But this is 12B-6, Rep. I feel like we're all playing pretty fast and loose here. But the complaint included the incident report. So that's what you're quoting is the appendices. That's what I'm quoting from the actual incident report. That's all I had to know. So I think that the allegations in the complaint, if they're contradicted by the evidence attached to the complaint, carry no weight. You said he was not, or Mr. Gibbons said he was not in reality. That's not an excuse for not complying. What that is is it affects what the officers can reasonably do under the circumstances. They did everything reasonable to get this not-in-reality person who had committed a serious felony out of the cab as quickly and safely as possible. They went in not simultaneously. Mr. Gibbons just said that this all happened simultaneously. This occurred over the span of three hours. One tactic didn't work. They tried another one. They tried another one. They tried another one. Yes, eventually they put the dog in. He was resisting to the point where he fought off a police dog. Then the SWAT officers, once they had seen in the cab that he did not appear to have a gun, then they made the decision we'll go in and grab him and remove him. That's what happened here. Thank you. All right. Mr. Kunienski.   I appreciate Judge Smith's question, because it's the same series of questions I have. What do you say these officers should have done? I still haven't heard it. The interesting thing is we're in agreement all the way up until the very end. Then once they enter the cab of the truck, apparently that's where we're in disagreement. Well, we have an individual that's acting out of it for whatever reason. He has a knife, a pocket knife or whatever. He pulls it. One of the officers grabs him by the wrist. He is resisting in every way possible. I still haven't heard how in the world they were supposed to handcuff him and get him out of that cab of that vehicle that they didn't do in a very reasonable manner. I still haven't heard how this situation is distinguishable from Anderson v. Estrada. I submit it's almost the exact same situation in a case this court decided only ten months ago. Finally, yes, this is at an early 12b6 stage, but it's very different than your normal 12b6 case. The reason it's different is because the plaintiff chose to attach a 60-page offense report to the complaint, and the law is that that's part of the complaint, and all the facts in that can be considered. What makes this case even more interesting is that he admits to the plaintiff that he was totally out of it and doesn't know anything about it. So we have a plaintiff that can't refute any facts, and we have a 60-page offense report of the facts that presumably is taken as true. It presents the plaintiff in a very bad light of somebody that's fighting all the way to the hospital, as a matter of fact. Attempting to bite the officers? I think he was trying to bite people. He's also at the hospital. Apparently he's fighting staff there. I mean, this was a very difficult situation where, quite frankly, he could have been killed, but the police officers didn't use any guns. They didn't use any weapons, anything. They did the minimal amount of force that was necessary to get him out of that truck, and, quite frankly, I think Mr. Cutshaw owes them his life. All right. Thank you, Mr. Kuczynski. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.